IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ORA HARPER )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY BERRYHILL,[1] Acting )<br>Commissioner Social Security )<br>)<br>Defendant. ) | No. 16 C 5075<br><br>Jeffrey T. Gilbert<br>Magistrate Judge |

### MEMORANDUM OPINION AND ORDER

Claimant Ora Harper ("Claimant") seeks review of the final decision of Respondent Nancy Berryhill, Acting Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 6.]

Pursuant to Federal Rule of Civil Procedure 56, Claimant and the Commissioner have both moved for summary judgment. [ECF Nos. 12, 19.] For the reasons stated below, Claimant's Motion for Summary Judgment is granted, and the Commissioner's Motion is denied. The case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Colvin is automatically substituted as the Defendant in this case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Claimant filed an application for DIB on October 22, 2012, and for SSI on October 24, 2012, alleging a disability onset date of September 28, 2012. (R. 168-77.) After an initial denial and a denial on reconsideration, Claimant filed a request for an administrative hearing on June 25, 2013. (R. 116-21.) Claimant, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on July 22, 2014. No medical expert was present, though a vocational expert ("VE") also appeared and testified. (R. 26-52.)

On November 24, 2014, the ALJ issued a written decision denying Claimant's application for SSI and DIB based on the finding that she was not disabled under the Social Security Act. (R. 10-18.) Following the familiar five-step sequential evaluation process, the ALJ found at step one that Claimant had not engaged in substantial gainful activity since her alleged onset date. (R. 12.) Claimant's severe impairments at step two were bilateral knee arthralgia, status post left knee surgery and post right shoulder surgery, right shoulder arthralgia, and obesity. (R. 12.) Her non-severe impairments included depression and anxiety, status post left ankle sprain, status post plantar fibroma excision, glaucoma, blepharitis (eyelid inflammation), and left elbow arthralgia. (R. 13.) At step three, the ALJ concluded that none of these impairments met or medically equaled listing 1.02 (major dysfunction of a joint) either singly or in combination. (R. 14-15.)

Before moving to step four, the ALJ determined that Plaintiff's testimony about the severity and frequency of her symptoms was not fully credible. (R. 17.) The ALJ also found that the opinions of the state-agency experts Dr. David Bitzer and Dr. Ernst Bone were entitled to some but not full weight. Based on these non-examining reports and the objective medical evidence, the ALJ concluded that Claimant had the residual functional capacity ("RFC") to

perform sedentary work as long as several non-exertional restrictions were present. Claimant can occasionally balance with a cane and can frequently climb ramps and stairs, as well as frequently stoop, kneel, crouch, and crawl. Claimant must never climb ladders, ropes, or scaffolds. (R. 15.) Based on this RFC, the ALJ found at step four that Claimant could perform her past relevant work as an administrative assistant. Accordingly, the ALJ did not proceed to step five and concluded that Claimant was not disabled. (R. 18.) The Social Security Appeals Council subsequently denied Claimant's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 1-4.) Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standard in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's

decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### III. DISCUSSION

Claimant asserts that the ALJ erred on two grounds. First, she argues that the ALJ's credibility determination is flawed. Second, Claimant contends that the ALJ's RFC assessment does not adequately account for the full extent of her limitations. For the reasons discussed below, the Court agrees that remand is required on both issues.

A.  **The ALJ Did Not Properly Evaluate Plaintiff's Credibility**

The regulations describe a two-step process for evaluating a claimant's description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p.[2] If such an impairment exists, the ALJ must

---

[2] The Social Security Administration recently updated its guidance for evaluating symptoms in disability cases. SSR 16-3p, 2016 WL 1119029 (effective March 26, 2016). The new ruling supersedes

4

"evaluate the intensity and persistence" of those symptoms and assess the degree to which they limit the claimant's ability to work. (*Id*.). In evaluating a claimant's symptoms, an ALJ should consider a claimant's daily activities, the frequency and intensity of the relevant symptoms, the type and effectiveness of medication, non-medication treatment, and any other measures the claimant may have taken to relieve her symptoms. SSR 16-3p.

Claimant received treatment for cataracts, glaucoma, and various muscular and orthopedic complaints. She also complained of pain in her eyes, head, shoulders, hands, and feet. The ALJ discounted the severity of the symptoms that Claimant reported by finding that the record only showed "minimal and generally conservative treatment" that conflicts with her position that she was disabled. (R. 17.) It is true that the record contains limited notes concerning Claimant's medical care. That said, however, the ALJ's reliance on that fact, standing alone, is not sufficient in this case to support his rejection of Claimant's testimony. SSR 16-3p instructs ALJs that when a claimant's allegations are at odds with the frequency of her treatment, "[w]e will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints." SSR 16-3p. An inability to pay for treatment, for instance, may explain why an individual did not receive more frequent medical care. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

In this case, Claimant told the ALJ that she lacked health insurance during most of the alleged disability period and had no income to pay for treatment because her husband is unemployed. (R. 36, 39.) Despite Claimant's testimony, the ALJ made no attempt to question

---

SSR 96-7p and eliminates the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character. *Id*. at *1. Since the regulation merely clarifies rather than changes existing law, it is appropriate to evaluate Plaintiff's credibility argument in light of the new guidance. *Williams v. Colvin*, No. 15 CV 0771, 2016 WL 6778219, at *2 (N.D. Ill. Nov. 14, 2016).

her at the hearing about how her lack of insurance limited the medical care that she received. Nor did the ALJ note in the decision that Plaintiff lacked insurance or the money to pay for her doctors. That means that the ALJ, apparently, did not consider whether the admittedly limited medical record in this case was a function of Claimant's inability to afford medical treatment instead of a sign that she was not as restricted as she claimed. An ALJ errs by failing to question a claimant on her inability to pay for care and by not discussing the issue in the disability analysis. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

The ALJ's failure to address the issue is compounded by his unexplained dismissal of Claimant's treatment history as conservative. Claimant already had undergone cataract surgery, shoulder decompression surgery, and knee surgery for a torn meniscus prior to her alleged onset date of September 28, 2012. Those operations led the ALJ to find that she suffered from the severe impairments of post left knee surgery and post right shoulder surgery. (R. 12.) Claimant also had a plantar fibroma excision on one foot in 2006 and a second excision on the other foot in November 2013. (R. 326.) She told the ALJ that she would be undergoing a second cataract surgery a few days after the administrative hearing, a claim that the record supports. (R. 420.) Moreover, the record shows that Claimant made fourteen visits to the Illinois Eye Institute for glaucoma treatment and other eye care between 2011 and 2014. (R. 270, 272, 274, 281, 285, 289, 294, 298, 302, 306, 396, 423, 373, 378). In light of the record, the ALJ's statement that Claimant's treatment had been conservative – without more – "does not provide any insight into the severity of a given condition and may even belie the condition's seriousness." *Viverette v. Astrue*, No. 07-CV-395, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). In this case, it also fails to consider whether Claimant would have received more intense treatment if she had been

able to afford it. Claimant's doctors clearly thought at times that further investigation was required into her condition. On July 16, 2013, for example, Dr. Benjamin Goldberg ordered an MRI study of Claimant's right shoulder after she complained of pain. (R. 367.) The record does not indicate that Claimant ever had the MRI. The ALJ did not inquire why that was the case.

The ALJ's belief that Claimant only received conservative care was accompanied by his skepticism about the degree of pain that she alleged she experienced. The ALJ noted an absence of records and tests that confirmed Claimant's complaints. Allegations of pain, however, cannot be dismissed merely because they are not corroborated by objective tests. *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("An ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results."). SSR 16-3p stresses that, although objective tests are important indicators of conditions like pain, "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." SSR 16-3p, at *4. An ALJ must therefore consider the factors identified above such as a claimant's daily activities, medications, and the frequency and duration of his pain and other symptoms.

The ALJ failed to follow this directive on multiple fronts. He never noted, for example, that Claimant had been prescribed the narcotic pain medication Vicodin off and on throughout her disability period as well as other pain medications such as Norco and Tramadol. (R. 369.) The use of prescription pain medication is objective evidence that can support an individual's assertions of pain. *See Stark v. Colvin*, 813 F.3d 684, 687-88 (7th Cir. 2016); *see also Spaulding v. Astrue*, 702 F. Supp.2d 983, 999 (N.D. Ill. 2010) (stating that an ALJ errs when he fails to consider all of a claimant's relevant medications). The use of strong pain medication can also run counter to an ALJ's conclusion that a claimant only received conservative care. *See*

7

*Solleveld v. Colvin*, No. 12 C 10193, 2014 WL 4100138 (N.D. Ill. Aug. 20, 2014) ("Although in some cases conservative treatment may contradict the severity of the limitations alleged, here the record shows that Solleveld was prescribed narcotics, including Vicodin and Norco, numerous times over her treatment history."); *see also Cunningham v. Colvin*, No. 14 C 420, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) (citing cases).

The ALJ bolstered his characterization of Claimant's pain treatment by stating that she did not make serious pain-related complaints to her doctors. In support, the ALJ cited a June 6, 2013, treatment note from Dr. Gabriela Baeza to show that Claimant did not experience significant shoulder pain, stating that Claimant only saw Dr. Baeza for "routine maintenance treatment" of her shoulder and reported that she had "no chronic medical condition." (R. 16.) Contrary to the ALJ's statement, however, Dr. Baeza's note includes serious complaints of pain. She stated that Claimant suffered from "Chronic R[ight] Shoulder Instability" and "[R]ight Shoulder Pain" that was being treated with three narcotic pain medications -- Vicodin, Norco, and Tramadol. (R. 369.) The ALJ never explained how a patient who requires three powerful prescription medications to control her pain can be characterized as receiving only "routine" treatment that undercuts her allegations of pain. Moreover, the ALJ failed to note that only one month later, Claimant again sought out orthopedic surgeon Dr. Benjamin Goldberg for her shoulder, complaining that her pain levels had been increasing for the past few months. (R. 366.)

The ALJ also supported his dismissal of Claimant's pain allegations based on a December 23, 2011, consultation she had with Dr. Goldberg for continuing shoulder pain. The ALJ said that Dr. Goldberg's entry only showed "minimal objective findings" that did not support Claimant's allegations. (R. 16.) That overlooks that Claimant told Dr. Goldberg that her pain was at the level of eight on a scale of one to ten. Dr. Goldberg clearly credited her

8

complaint by noting that Claimant's arms were "tight and painful" and by prescribing Vicodin to treat her discomfort. (R. 270-71.) The ALJ was required to cite the December 2011 doctor's note accurately and explain how Dr. Goldberg's prescription of Vicodin to treat pain at an eight out of ten level can be dismissed as a minimal finding. *See Ahmad v. Colvin*, No. 14 C 2959, 2016 WL 98567, at *7 (N.D. Ill. Jan. 8, 2016) ("Plaintiff does not allege she is paralyzed by pain; she essentially claims that her pain prevents her from working on a full time basis."). It is true, as the ALJ further stated, that Claimant did not always complain of shoulder and knee pain at all of her medical consultations. That begs the question, however, of why she would have been expected to do so. Claimant's relatively few medical consultations involved treatment for different parts of her body, including her feet, knees, shoulders, and eyes. The ALJ never addressed why an individual who is seeking medical care for foot pain should be expected to complain of shoulder and knee discomfort, or why Claimant would discuss her knee pain while consulting an optometrist or ophthalmologist for glaucoma.

One of Claimant's central complaints concerned her vision. She told the ALJ that she stopped working, in part, because of severe headaches that stemmed from her vision problems. (R. 32.) Working on her computer caused close-vision blurriness and photophobia that required her to rest and apply water to the eyes. (R. 37.) The ALJ did notconsider these claims in his credibility decision, stating instead that Claimant had been able to continue to work despite her vision problems. (R. 13.) That overlooks that Claimant testified that she stopped working, in part, because her vision problems created severe headaches that kept her from focusing properly. (R. 32.) Nor did the ALJ note that Claimant had partial blind spots from her glaucoma or account for the fact that she had been prescribed Azport and Travatan eye drops for glaucoma,

9

prednisone acetate drops, and Restasis. (R. 403, 447.) *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) ("An ALJ may not ignore entire lines of evidence.").

In addition to the medical record, SSR 16-3p instructs ALJs to consider a claimant's activities of daily living ("ADLs") when assessing the severity of her symptoms. Unfortunately, the ALJ overlooked most of what Claimant told him at the hearing on that topic. She testified that her husband performed most of the routine household chores such as shopping, making breakfast, cleaning, and laundering clothes. (R. 42.) In the written account of her ADLs, Claimant further stated that she needs help lifting her arms to dress, requires assistance getting in and out of the bathtub, and takes twenty minutes to make the bed. (R. 231-32.) Instead of taking these claims into account, the ALJ concluded that Claimant was not fully credible because she reported that she goes to church regularly, does puzzles, makes grocery lists, and walks to the corner store. (R. 17.) Claimant actually testified, however, that it takes her forty-five minutes to an hour to walk two blocks to the store and back; and she only does puzzles "sometimes." (R. 232-33.) As for going to church and making grocery lists, the ALJ provided no explanation of why Claimant's ability to carry out such basic activities was evidence that she was not believable and could work on a full-time basis. The ALJ failed to build a logical bridge between the record and his conclusions based on Claimant's ADLs. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.").

The only part of Claimant's testimony that the ALJ considered in any detail was her claim that she had used a cane since 2011. Plaintiff told the ALJ that she began using a cane

10

after her 2011 knee surgery because she was experiencing problems with her balance. (R. 41.) The ALJ rejected that claim based on two consultative reports that were issued in January 2013. The first was from internal medicine specialist Dr. Alexander Panagos, who examined Claimant on January 18, 2013, at the request of the Social Security Administration. He diagnosed Claimant with arthralgias in both knees and the left elbow. (R. 316.) The ALJ interpreted Dr. Panagos' report to mean that Claimant did not need a cane in order to walk. That implies an RFC finding that Dr. Panagos never made. Moreover, Dr. Panagos never said that Claimant did not "need" to use a cane; he only found that she did not "use" one to ambulate during his examination of her. (R. 316.) The distinction between "use" and "need" is important because Claimant told Dr. Panagos that she only needed the cane to walk more than fifty feet. (R. 314.) Therefore, Dr. Panagos' report provides no evidence that contradicts Claimant's assertion on that point because Dr. Panagos did not describe how far Claimant was able to walk without her cane. The ALJ could easily have clarified the issue by asking Claimant at the hearing when and why she needed to use a cane. Not having done so, however, he did not adequately explain why Dr. Panagos' report undermined Claimant's testimony.

The ALJ further relied on a report issued by psychiatrist Dr. Henry Fine, who also examined Claimant for the Social Security Administration. The ALJ pointed out that Dr. Fine noted that Claimant's posture and gait were normal and cited that to support his conclusion that Claimant did not need to use a cane. Dr. Fine's comment fails to support the ALJ's conclusion for three important reasons. First, there is no suggestion that Dr. Fine's remark was based on a physical exam or was anything other than a casual observation made during a psychiatric consultation. By contrast, Dr. Panagos performed a physical exam showing that Claimant's gait was *not* normal. Dr. Panagos stated that she showed a slow gait with "problems with tandem

gait, heel walk and toe walk." (R. 316.) The ALJ never noted that contradiction between the medical experts or tried to resolve it. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do."). Second, the ALJ never explained why Claimant's gait was even relevant to the use of her cane. She told the ALJ that she used the cane for balance, not to correct an unsteady gait. (R. 41.) Her written ADLs also state that she uses a cane because she occasionally becomes dizzy. (R. 232-33.) Even assuming that Claimant's gait was steady, the ALJ never explained why that necessarily meant that she did not need to use a cane for the reasons she said she needed to use one.

Third, and most importantly, the ALJ failed to explain what he did and did not find credible about Claimant's testimony concerning her cane. The ALJ implied that Dr. Panagos' and Dr. Fine's reports meant that Claimant did not need a cane at all. In the RFC, however, the ALJ stated that she could use the cane to "occasionally balance." (R. 15.) That means that the ALJ concluded that some part of Claimant's testimony about her cane was credible even though he only discussed reasons why it was not credible. Without addressing the issue, it is unclear why the ALJ credited some but not all of Claimant's testimony. That makes it impossible to follow the logic of the ALJ's reasoning. Remand is therefore required so that the ALJ can properly evaluate the severity of Claimant's symptoms by applying the guidelines provided in SSR 16-3p.

**B.      The ALJ Failed to Explain the Basis for the RFC Assessment**

A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1). "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground

12

and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also* 20 C.F.R. § 404.1545(3). The ALJ found that Claimant can perform sedentary work, which requires lifting no more than ten pounds, standing or walking up to two hours daily, and sitting for six hours in an eight-hour work day. The ALJ also included various non-exertional restrictions. He said Claimant can frequently climb ramps and stairs, stoop, kneel, crouch, and crawl. She may also use a cane occasionally to balance herself. Claimant can never climb ladders, ropes, or scaffolds. (R. 15.) No mental restrictions were included in the RFC.

The ALJ's failure to explain why Claimant's mental impairments of depression and anxiety did not impose any limitations on her ability to work was error. He found at step two that these impairments were non-severe and that they caused mild limitations in her ADLs, social functioning, and ability to maintain concentration, persistence, and pace.[3] (R. 13-14.) Such step two or step three findings cannot function as a mental RFC assessment at later stages of the ALJ's decision. Instead, "[t]he mental RFC assessment used at steps 4 and 5 . . . requires a more detailed assessment" of a claimant's mental functioning. SSR 96-8p. The ALJ, however, never addressed Claimant's mental functioning after step two. He may have thought that he did not need to provide an additional discussion of the issue because Claimant's mental impairments were non-severe. It is well established, however, that an ALJ is required to "consider the

---

[3] For the reasons discussed below, it is not clear why the ALJ concluded at step two that Claimant's depression and anxiety were not severe. Remand is not required on that basis because an ALJ does not err at step two as long as one severe impairment is assessed and the sequential analysis proceeds to step three. *See Curvin v. Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015). "What matters is that the ALJ considers the impact of all of the claimant's impairments – 'severe' and 'not severe' – on her ability to work." *Gordon v. Astrue*, No. 4:07 CV 042, 2007 WL 4150328, at *7 (S.D. Ind. Nov. 13, 2007). Since this case already will be remanded, however, the ALJ should explain more carefully how Dr. Fine's psychiatric report supports a conclusion that Claimant does not have a severe mental disorder.

combined effect of all impairments, 'even those that would not be considered severe in isolation.'" *Alesia v. Astrue*, 789 F. Supp.2d 921, 933 (N.D. Ill. 2011) (quoting *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). An ALJ's "failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

The ALJ's oversight of Claimant's mental impairments might constitute harmless error if the record supported the absence of any mental restrictions in the RFC. It is far from clear, however, why that is the case. It is true that the non-examining state-agency experts, Dr. Lionel Hudspeth and Dr. David Voss, found that Claimant's mental impairments were not severe. The ALJ assigned great weight to their opinions based on the objective record, which consisted almost exclusively of Dr. Fine's psychiatric report discussed earlier. Unfortunately, the ALJ seriously mischaracterized what Dr. Fine said, failing even to note the psychiatrist's diagnosis or the descriptions he gave of Claimant's condition. The ALJ thought that the report only showed "minimal objective examination findings," correct mathematical calculations, and no delusions. (R. 14.) But Dr. Fine concluded that Claimant suffers from post-traumatic stress disorder ("PTSD") with an "affective component" that stemmed, at least in part, from abuse that she encountered as a child. (R. 322.) The ALJ should have been alert to that statement because Claimant described her abuse at the hearing. (R. 38.) Far from being "minimal," Dr. Fine's diagnosis included assessments of "depression with suicidality," auditory hallucinations, and paranoid thinking. (R. 322.) The Court is unable to follow the ALJ's reasoning that such descriptions can be dismissed as minimal findings. *See Johnson-Bates v. Colvin*, No. 14 C 3537, 2015 WL 8153736, at *5 (N.D. Ill. Dec. 8, 2015) (finding no logical bridge between a diagnosis of major depression and an ALJ's claim that a mental status exam was normal). At a minimum, the ALJ was obligated to account for Dr. Fine's actual diagnosis and explain the basis for his

14

reasoning with greater care. *See Giebudowski v. Colvin*, 981 F. Supp.2d 765, 779 (N.D. Ill. 2013) ("Although the ALJ is not required to address every piece of medical evidence presented, an ALJ fails to build a logical bridge supporting her decision when she fails to address evidence that could support a Claimant's allegations.").

The ALJ's assessment and discussion of Claimant's mental condition was made more difficult because Claimant failed to provide any treatment records to support her claim that she had been receiving psychiatric care, including therapy and prescriptions for the antidepressant drug Prozac and the tranquilizer Xanax. Claimant's attorney promised (but failed) to supply those records to the ALJ, who left the record open for thirty days for that purpose. (R. 39, 52.) That said, this is not a case where no evidence existed concerning Claimant's mental health treatment. Claimant gave detailed testimony about her visits to mental health practitioners and treatment history, explaining that she had received psychiatric care from a Dr. Doshe at Loretto Hospital for five years and had previously treated with a Dr. Brown. (R. 39.) Claimant was currently seeing Dr. Conn after recently becoming eligible for "County Care." (R. 39.) She even provided Dr. Conn's address and the date of her last appointment. (R. 51.) Moreover, the ALJ failed to note that the record contains some evidence of mental health treatment that was either the same, or analogous to, what Claimant described at the hearing. A series of largely illegible treatment notes from 2005 through 2008 show that Claimant was treated with Prozac and the tetracyclic antidepressants Remeron and trazedone (Desyrel), sometimes in combination with one another. (R. 461, 469, 475, 476.) A note dated August 25, 2005 also states that Claimant had been hospitalized for bipolar disorder, which is also reflected in Dr. Fine's report. (R. 320, 496.)

It is true that these records describe treatment prior to Claimant's alleged disability period and do not necessarily reflect her condition during that period. However, they are still evidence that confirmed part of Claimant's testimony and suggested that her mental condition could not be set aside without further consideration. *See Doherty v. Astrue*, No. 11 CV 838, 2012 WL 4470264, at *5 (S.D. Ind. Sept. 27, 2012) (noting that pre-onset evidence can be relevant to assessing a claimant's post-onset condition). That possibility is enhanced by the fact that the record during Claimant's disability period also contains lists of her "Documented Diagnostic Problem[s]," including a diagnosis of depression. (R. 327, 369.) A diagnosis of depression implies that Claimant had at least some symptoms that required consideration by the ALJ. *See O'Connor-Spinner v. Colvin*, 832 F.3d 690, 693 (7th Cir. 2016) ("A diagnosis of 'major depression' means, *by definition*, that an individual's symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.") (internal quotes and citation omitted). That fact, combined with Dr. Fine's assessment, suggests a mental health history that the ALJ was not entitled simply to dismiss at the RFC stage without discussing why no mental RFC restrictions were necessary. Remand is therefore required so that the ALJ can consider what limitations, if any, are appropriate.

As for the physical RFC of sedentary work, the ALJ stated that he gave some weight to the January 30, 2013, RFC of state-agency expert Dr. David Bitzer. (R. 17.) Dr. Bitzer found that Claimant could perform light work by carrying ten pounds frequently and twenty pounds occasionally and by standing and walking for up to six hours in an eight-hour workday. (R. 59.) The ALJ disagreed with these findings, concluding that Claimant could only lift ten pounds and stand or walk for two hours. (R. 15.) The ALJ also disagreed with Dr. Bitzer's finding that Claimant could climb ladders, ropes, and scaffolds frequently; the ALJ said that she could never

16

carry out these activities. Dr. Bitzer further concluded that Claimant had some limitation in using her right arm to reach overhead, limiting it to frequent reaching during the day. (R. 60.) The ALJ concluded that she did not need any restrictions in reaching overhead. He also disagreed with Dr. Bitzer's statement that Claimant had a limited ability to see small objects at a distance. The ALJ found that she had no limitations in her vision. Finally, the ALJ added a restriction allowing Claimant to use a cane occasionally to balance. Dr. Bitzer did not think that she needed to use one at all. (R. 15.)

The ALJ provided little or no explanation of how he reached these conclusions. The Commissioner argues that any error the ALJ may have made in this regard is harmless because his decision was more favorable to Claimant than Dr. Bitzer's. That might be true had the ALJ explained how he went about assessing the RFC. As it stands, however, the ALJ's repeated statements that Claimant only made "minimal complaints of pain" and that her tests revealed "minimal objective findings" suggests that Claimant had few exertional limitations, not that she was more limited than Dr. Bitzer said she was. (R. 16.) Nevertheless, the ALJ must have thought that Claimant had serious limitations notwithstanding the absence of objective evidence because a finding of sedentary work "represents a significantly restricted range of work." SSR 96-9p. Without any explanation of how he reached the RFC, it is impossible to determine how the ALJ interpreted the record to mean that Claimant could perform sedentary work instead of, say, a reduced range of sedentary work or no work at all. An ALJ errs when he fails to explain how he arrived at his or her RFC conclusions. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (noting that SSR 96-8p requires an ALJ to provide "a narrative discussing describing how the evidence supports each conclusion, citing specific medical facts"). Having rejected the only RFC in the record, and without a medical expert to clarify matters, the ALJ was

17

obligated to explain more carefully how the evidence supported his RFC assessment. *See Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis.").

The ALJ's findings concerning Claimant's need for a cane and her vision were of particular importance to the RFC. As noted above, the ALJ never explained how he concluded that Claimant would need to use her cane to balance. The VE testified that an individual would be able to perform Claimant's past relevant work if she needed to use a cane occasionally, meaning up to one-third of an eight-hour workday. But Claimant implied that she needed to use a cane more often than that, and the ALJ never identified any evidence or testimony that supported occasional use of the cane instead of frequent or constant use. An ALJ errs by failing to fully address the need for a cane in the RFC assessment. *See Newell v. Astrue*, 869 F. Supp.2d 875, 892 (N.D. Ill. 2012) ("Even when a cane is not prescribed by a physician, an ALJ errs when he does not include its use in the RFC *and* does not explain his reasons for not doing so."). In this case, remand is required so that the ALJ can articulate the basis of his reasoning. *See Scott*, 297 F.3d at 595 (explaining that an ALJ errs by not building "an accurate and logical bridge from the evidence to [his] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant a meaningful judicial review.") (internal quotes and citation omitted).

The same error undermines the ALJ's consideration of Claimant's eyesight. As noted, Claimant told the ALJ that she could not perform her past work because she experienced eye pain, headaches, and photophobia that made it difficult to concentrate. The ALJ did not think that required any RFC restrictions because Claimant's glaucoma was "stable." Yet courts have repeatedly held that "a person can have a condition that is both 'stable' and disabling at the same

18

time." *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008); *see also Hunt v. Astrue*, 889 F. Supp.2d 1129, 1144 (E.D. Wis. 2012). The ALJ also stated that the record did not support any visual limitations for Claimant. The record suggests otherwise. An August 16, 2011, report from the Illinois Eye Institute reflects that Claimant complained of eye pain caused by lights, was experiencing headaches, and was seeing halos and spots. (R. 423.) On January 23, 2012, she told her eye treater that she had severe eye pain and redness in the eye that was constant and gave rise to headaches. (R. 298.) A February 27, 2012, report noted complaints of eye pain that affected Claimants near and far vision. (R. 294.) A June 7, 2014, note from the Illinois Eye Institute states that Claimant had experienced a gradual onset of blurry vision in the right eye that was associated with photophobia and required cataract surgery. (R. 373.)

The ALJ failed to note any of these entries in Claimant's medical records. The issue was critical to the ALJ's decision because Claimant told him that her prior job involved significant amounts of work on a computer that aggravated her eye pain. So did the job that the ALJ said that Claimant could perform. He identified Claimant's work as an administrative assistant under Dictionary of Occupational Category ("DOT") listing 160.167-010. The DOT states that such a position would require Claimant to "compile, store, and retrieve management data, using [a] computer." That involves work that Claimant said she could not perform. Without considering her testimony, medications, or medical records, the ALJ failed to draw a logical bridge between the record and his finding that Claimant could carry out such work with what she claimed was limited and painful close vision. Remand is therefore required so that the ALJ can restate the basis for Claimant's physical RFC and explain what restrictions, if any, are necessary to accommodate her mental impairments.

## IV. CONCLUSION

For the reasons stated above, Claimant's Motion for Summary Judgment [ECF No. 12] is granted. The Commissioner's Motion for Summary Judgment [ECF No. 19] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: April 3, 2017